

The following constitutes the order of the Court.
Signed: January 7, 2019

_____
M. Elaine Hammond
U.S. Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br>Janet Morazan-Aviles<br><br>Debtor(s). | Case No. 16-50030 MEH<br>Chapter 13 |
| Marvin Morazan,<br>                Plaintiff.<br>v.<br>Janet Morazan-Aviles,<br>                Defendant. | Adv. No. 16-05026<br><br>Date:   October 10 & 24, 2018<br>Time:  9:00 a.m.<br>Ctrm:  3020 (San Jose) |

## MEMORANDUM DECISION

Debtor Janet Morazan-Aviles ("Defendant") filed the underlying bankruptcy case and seeks to discharge her debts through a chapter 13 plan. Her brother, Marvin Morazan ("Plaintiff") filed this adversary proceeding alleging that Defendant took assets of their parents to Plaintiff's detriment. Plaintiff requests this court determine the allowed amount of his claim against Defendant and find that his claim is excepted from discharge pursuant to

Bankruptcy Code § 523(a)(2)(A), (a)(4), or (a)(6).[1]  A trial was held and this matter was taken under submission on October 24, 2018.  For the reasons stated below, I find that Plaintiff failed to establish a claim against Defendant.

This court has jurisdiction pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B) and (I). Further, this court has jurisdiction to enter findings of fact and conclusions of law in non-core proceedings "that either 'arise-under' the Bankruptcy Code, 'arise in' a case under the Code, or 'relate to' a case under the Code." *LLC v. In re Ray (In re Ray)*, 624 F.3d 1124, 1130 (9th Cir. 2010) (citing 28 U.S.C. § 157(a) and (b)).  Both parties consent to entry of a final judgment by this court on all claims.

*Background*

Edgar and Teresa Morazan ("Edgar" and "Teresa") were the parents of Plaintiff and Defendant.  They had two additional children together: Leonardo Morazan ("Leo") and Harold Morazan ("Harold").  In addition, Edgar had two other children: Patricia Morazan ("Patricia") and Norma Morazan ("Norma").

*Edgar and Teresa's reliance on their children*

Edgar graduated college with a degree in accounting from a college in El Salvador and was able to read, write, and speak in English although he had an interpreter for legal matters and would often be accompanied by one of his children to medical appointments.  Teresa understood but did not have a strong command of the English language; she requested family members assist her in translating English.  Throughout the period in dispute, Edgar and Teresa were surrounded by various members of their family.  Plaintiff testified that Edgar could not drive the last six months of his life due to cancer but never stated he was in a vulnerable mental state.  In fact, Plaintiff testified he assumed Edgar capable of taking care of his financial decisions at the time.  Regarding Teresa, Plaintiff testified her cirrhosis of the

---

[1] Unless specified otherwise, all chapter, code and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, and the Federal Rules of Bankruptcy Procedure, Rules 1001–9037 (referred to herein as the "Bankruptcy Code").

liver was the primary reason for moving into Plaintiff's house but does not indicate this impacted her mental capacity. No family member testified that Edgar or Teresa lacked mental capacity or were in a vulnerable mental state.

Defendant is the youngest of Edgar and Teresa's children. While she was still a teen her father began relying on her for assistance with financial matters. Beginning at age 18, Defendant would be given cash by Edgar and she would then pay the family bills from her bank account, either by cash or check. This was their standard procedure for over 20 years. For many years, Edgar and Teresa lived with Defendant and helped in raising her family. Four current and former family members credibly testified that Defendant and Edgar had a particularly close and special relationship. The evidence shows that Edgar favored Defendant in many ways, while also relying on her for more support than the older siblings.

Plaintiff's relationship with Edgar was more complicated. Plaintiff owns a roofing business. At various times he employed Edgar. Leo, the oldest brother, Plaintiff's ex-wife, and Defendant's ex-husband each testified that on several occasions Plaintiff dismissed Edgar from his employment, or Plaintiff and Edgar would have a dispute where they would not speak with each other for months. The circumstances surrounding these events are disputed but substantial testimony establishes that the on-going relationship between Edgar and Plaintiff was contentious.

In October 2006, Edgar was diagnosed with mesothelioma resulting from his work in the shipyards. The parents' housing changed following Edgar's mesothelioma. Sometime in 2007, Edgar and Teresa moved into Plaintiff's house at Plaintiff's insistence. Following the move, Plaintiff provided household support and drove the parents to doctor's appointments while Defendant continued to assist with their finances.

Also, following his diagnosis, Edgar retained Levin Simes Kaiser & Gornick ("Law Firm") to represent him in a personal injury action based on the mesothelioma and asbestos injury. The Law Firm obtained a settlement for Edgar that paid out funds in various amounts over an indefinite period of time (the "Settlement Funds"). The Settlement Funds are the center of this dispute. Testimony of the parties and evidence presented establish that Edgar

3

provided Defendant with joint control over the funds received, and Defendant assisted Edgar with the disposition of funds. Meanwhile, Edgar provided the remaining family members with no information on the amounts received and did not discuss with them how the money was being spent—other than making gifts to individual family members. Receipt of the Settlement Funds was irregular and Edgar was generous. Over $550,000 was spent by the time of Edgar's death.

The total amount of Settlement Funds received was not known by all family members until after Teresa's death. Plaintiff was troubled to learn how much was received and how little was left. He began asking questions of the Law Firm and Defendant. Defendant initially asserted that she did not take or use Edgar and Teresa's money for herself.[2] Over the course of litigation her position shifted to the argument presented here; that she used funds for her benefit given to her by Edgar and Teresa.

*Settlement Funds received by Edgar*

When Edgar received the first check for Settlement Funds, he enlisted Defendant's help in opening a bank account. Edgar and Defendant went to Citibank and opened a joint account on January 25, 2008. Defendant testified that during the process of opening the account, Edgar was able to read through the account documents and understand the details of what he was creating with the bank. Consistent with their past practices, Defendant would receive a check for Settlement Funds, take it to Edgar to endorse, and then deposit the check into the Citibank account. Ultimately, Edgar received eight checks totaling $568,976.54 prior to his death; of these, seven were deposited into the Citibank account.[3] Edgar died on October 16, 2008.

---

[2] Exhibits 31 and 32
[3] One check for $43,624 was deposited into a Wells Fargo account that Defendant held solely in her name.

4

*Settlement Funds received by Teresa*

Following Edgar's death, Teresa received a check payable to Edgar on account of the Settlement Funds. Nine checks, totaling $148,091.25, were received between Edgar's death and Teresa's death in June 2011.

Two months after she received the first check, Teresa signed a letter requesting that all funds from the case be issued to Defendant. As the Law Firm later explained to Plaintiff in an email, Teresa spoke with people in the Law Firm on a few occasions and directed the Law Firm "to forward the proceeds of any settlement to her in care of [Defendant] . .. [Teresa] was concerned about losing her Medicare eligibility if she had too much money in her personal bank account."[4] The Law Firm continued to forward releases for Teresa's signature since it was her lawsuit.[5] Teresa could not afford a needed liver transplant if her Medicare coverage was affected. Teresa passed away in June 2011, after undergoing transplant surgery earlier that year.

Teresa died intestate. Following her death, the Law Firm prepared an "Agreement re Distribution of Survival and Wrongful Death Settlements." Pursuant to its terms, each payment is divided by six, and separate checks are issued to each of Edgar's children. Thus, all claims based on the Settlement Funds relate to the period when Edgar and/or Teresa was alive.

*Use of the Settlement Funds*

Until Edgar received the Settlement Funds, the family did not have significant assets. When Edgar began to receive the Settlement Funds he did not know when or how much would ultimately be received—in addition to not knowing how much longer he would be alive to benefit. Edgar chose to provide gifts to family members and friends based on what each recipient appeared to need. For example, in 2008, Edgar (through Defendant) paid off Leo's credit card debt and provided Harold with money to pay off the financing on a van

---

[4] Exhibit 55
[5] *Id.*

5

Harold had recently purchased.  As discussed more below, Edgar also purchased a van for Plaintiff's use and gave Defendant money.  Edgar traveled to El Salvador to visit family members and provided financial help there. Towards the end of his life, Edgar learned that the Settlement Funds received to that point were gone when he told Defendant to send money to an uncle and was informed that there was not enough money to do so.

Teresa used the Settlement Funds that were received following Edgar's death.  She enjoyed travel with various family members.  Teresa paid most of the costs associated with a trip to Hawaii and a large family Disneyland trip, in addition to trips to Southern California and Reno, Nevada.  She also helped Patricia buy a car and assisted Defendant with repair work on her home.  On the day that Teresa went to the hospital for her liver transplant, she gave Plaintiff $30,000 in cash to be shared with Leo and Harold.

Absent undue influence, use of the Settlement Funds as chosen by Edgar or Teresa is valid and appropriate.  Neither parent was under an obligation to equitably share the Settlement Funds among their heirs or other family members.

## Analysis

Plaintiff asserts claims against Defendant based on the Settlement Funds received during Edgar and Teresa's lives, a van purchased by Edgar and given to Plaintiff, and real property in San Jose that was owned and used by various family members over an extended period.

1) *Allegations re Settlement Funds*

Plaintiff alleges Defendant improperly received or controlled disposition of the Settlement Funds to her benefit.  Plaintiff asserts that significant funds were issued to Plaintiff either without Edgar or Teresa's knowledge, or as a result of Defendant's undue influence over them.

*(A) Embezzlement – Bankruptcy Code § 523(a)(4)*

Plaintiff alleges Defendant embezzled their parents' assets through her handling of the Settlement Funds.[6] He seeks to have any claim based on embezzlement excepted from discharge pursuant to § 523(a)(4). "[E]mbezzlement in the context of nondischargeability has often been defined as 'the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come.'" *In re Littleton,* 942 F.2d 551, 555 (9th Cir. 1991). Embezzlement requires three elements: "(1) property rightfully in the possession of a nonowner; (2) nonowner's appropriation of the property to a use other than which [it] was entrusted; and (3) circumstances indicating fraud." *Littleton*, 942 F.2d at 555 (9th Cir. 1991); *Tobkin v. Waltrip*, 985 F.2d 572 (9th Cir. 1993). Plaintiff bears the burden of proof by a preponderance of the evidence standard under § 523(a)(4). *In re Chui*, 538 B.R. 793, 800 (Bankr. N.D. Cal. 2015), *aff'd sub nom. Tradex Glob. Master Fund Spc Ltd. v. Chui*, 559 B.R. 520 (N.D. Cal. 2016), *aff'd* 702 F. App'x 632 (9th Cir. 2017).

*(1) Property Rightfully in the Possession of a Nonowner*

The parties established that the Settlement Funds were rightfully in the possession of Defendant, a nonowner. Edgar included Defendant as a joint account holder on the Citibank account and Teresa directed the Law Firm to forward the Settlement Funds to Defendant following Edgar's death.

*(2) Nonowner's Appropriation of the Property to a use Other Than Which it was Entrusted and Circumstances Indicating Fraud*

These two elements are the heart of the dispute between Plaintiff and Defendant. Plaintiff asserts that Defendant misappropriated the Settlement Funds by distributing significant amounts to herself and her family. He focuses on three checks written by Defendant to Defendant in the amounts of $100,000, $50,000, and $25,000. Additionally,

---

[6] Plaintiff asserts that he is entitled to a claim for 1/6 of any amount that Defendant is found to have improperly gained under any of the asserted claims on the theory that had these funds not been embezzled, they would have been part of the Teresa's estate following her death. I find this assertion of standing questionable but as the parties addressed each claim at trial, I do so here in the interest of judicial efficiency.

7

checks for $20,000 were issued by Defendant to each of her three children. Plaintiff asserts that these large transfers were made without Edgar or Teresa's approval.

Defendant disputes Plaintiff's characterization of the payments. She asserts that she only distributed Settlement Funds from the Citibank account with a parent's permission. As to the three large checks to Defendant, she asserts that Edgar authorized all three checks. She asserts that the check for $100,000 was authorized by Edgar when Defendant was anticipating a divorce from her husband and Edgar was concerned about her ability to survive financially. Then, the second check for $50,000 was authorized by Edgar for Defendant to use to pay off her credit card debt. The final check for $25,000 was a last gift from Edgar to Defendant during the last two weeks of his life. She asserts that Edgar authorized this check in front of Teresa while he was in the hospital. Following Edgar's death, Defendant asserts that she used the funds as directed by Teresa. Much of these funds were used towards family trips. Teresa also helped Patricia buy a new vehicle in 2010 by adding $10,000 toward the purchase of a new car. In addition, Teresa authorized funeral expenses for Edgar and purchased a funeral plot for Leo.

Neither Edgar nor Teresa provided written authorization to Defendant for how the Settlement Funds should be disbursed. As such, the testimony of surrounding witnesses is considered in determining the credibility of the positions of Plaintiff and Defendant. First, Plaintiff does not assert any direct evidence—oral or written—that Edgar or Teresa forbid or opposed Defendant issuing checks based on the Settlement Funds. Second, as all witnesses agree, Edgar made gifts to numerous family members once he began receiving the Settlement Funds. He paid off credit card bills and vehicle financing, purchased a vehicle, gave money to Plaintiff's business, and assisted relatives in El Salvador. Based on testimony from the children,[7] Edgar clearly enjoyed being generous with the Settlement Funds during his life. Third, during Teresa's life, funds were used for family travel that included Teresa. Various family members traveled with Teresa to Hawaii and to Disneyland for a large family trip. In addition, Teresa enjoyed trips to Reno to gamble. Indisputably, Defendant had more

---

[7] Plaintiff, Defendant, Harold and Leo

information than any of the other children about the amount of Settlement Funds received and how it was being spent. As the child handling her parents' money she was in a better position than her siblings to ask for funds, or make sure her parents were aware of her needs and financial concerns. Yet, without more, Plaintiff has not met his burden to establish that Defendant used the Settlement Funds without the knowledge of Edgar or Teresa, or for a use other than which she was entrusted with them. Further, as Defendant assisted her parents with bill paying prior to the Settlement Funds and had long been the family member they relied on, as she relied on them, the continuation of this relationship does not constitute circumstances indicating fraud.

As such, I find that Plaintiff did not establish that Defendant embezzled funds from Edgar and Teresa.

*B) Larceny – Bankruptcy Code § 523(a)(4)*

Closely related to embezzlement, Plaintiff alleges Defendant committed larceny under § 523(a)(4). In bankruptcy, federal common law defines larceny as the "felonious taking of another's personal property with intent to convert it or deprive the owner of the same." *In re Ormsby*, 591 F.3d 1199, 1205 (9th Cir. 2010). The major distinction that separates this from embezzlement is that the "the original taking of the property must be unlawful." *In re Jenkins*, 2015 WL 735799, at *5 (B.A.P. 9th Cir. Feb. 20, 2015). This requires initial possession of the property by Defendant to be wrongful. *See In re Woodman*, 451 B.R. 31, 38 (Bankr. D. Idaho 2011). Plaintiff bears the burden of proof by a preponderance of the evidence. *Chui*, 538 B.R. at 800.

There is no evidence that the original taking of the Settlement Funds was unlawful. Edgar opened a joint account with Defendant into which the Settlement Funds were deposited. As a joint account holder, Defendant had a legal right to use the funds in the Citibank account. Further, there is no evidence that she used the funds without Edgar's permission. Following Edgar's death, Teresa instructed the Law Firm to issue checks in

9

Defendant's name. Thus, the disbursing of the funds into Defendant's possession was not unlawful. Accordingly, Plaintiff did not establish a claim for larceny.

*C) Actual Fraud – Bankruptcy Code § 523(a)(2)*

Plaintiff alleges that Defendant committed actual fraud under § 523(a)(2)(A) because a portion of the Settlement Funds would have remained following the deaths of Edgar and Teresa if Defendant had properly handled the funds and not exercised undue influence over her parents.

In *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (2016), the Supreme Court recognized that § 523(a)(2) includes a claim for actual fraud even if there is no misrepresentation. The elements for actual fraud are based on common law. *Husky*, 136 S. Ct. at 1586. Several different types of fraud are identified in the California Civil Code. Deceit occurs when an individual suggests a fact he does not believe to be true or asserts a fact that he has no reasonable ground for believing to be true. Cal. Civ. Code § 1710(1)-(2). Concealment fraud occurs when there is a fiduciary relationship between the parties that creates a duty of full disclosure, and the concealing party does not disclose important facts. Cal. Civ. Code § 1710(3). Promissory fraud follows from a promise made without any intention of performing it. Cal. Civ. Code § 1710(4). Plaintiff bears the burden of proof on this claim. *In re Tripp*, 357 B.R. 544, 548 (Bankr. D. Ariz. 2006).

Plaintiff does not identify how Defendant committed fraud against him with regard to the Settlement Funds. Concealment of facts related to the Settlement Funds is most consistent with his other claims: that Defendant failed to inform Plaintiff how much the parents received in Settlement Funds and how much was paid to her as opposed to the other siblings. Yet, this claim does not succeed because a fiduciary obligation from Defendant to Plaintiff has not been established. Other than the payments made to or for Plaintiff at Edgar's direction, Plaintiff and Defendant did not discuss the Settlement Funds during their parents' lifetimes. Defendant asserts that Edgar and Teresa did not want Plaintiff to know about their financial

10

situation. Thus, deceit and promissory fraud do not apply. Accordingly, Plaintiff did not establish a claim for actual fraud.

*D) Conversion – California Common Law*

Plaintiff alleges Defendant improperly converted the Settlement Funds. "Conversion is the wrongful exercise of dominion over the property of another." *Welco Elecs., Inc. v. Mora*, 223 Cal. App. 4th 202, 208 (2014). It requires: "(1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages." *Welco*, 223 Cal. App. 4th at 208. The first element of conversion can be further clarified to mean "either ownership and the right of possession or actual possession" at the time of the alleged conversion . . . ." *Sanowicz v. Bacal*, 234 Cal. App. 4th 1027, 1041 (2015). Plaintiff bears the burden of proof. *Zaslow v. Kroenert*, 29 Cal. 2d 541, 550 (1946).

Plaintiff fails to satisfy the first requirement for conversion of the Settlement Funds. As the claim is premised on the argument that Defendant took Settlement Funds that belonged to Edgar or Teresa, Plaintiff lacked ownership or a right to possession of the Settlement Funds at the time of the alleged conversion. Accordingly, no claim for conversion of the Settlement Funds is established.

*E) Elder and Financial Abuse – California Welfare and Institutions Code §§ 15610.27, 15610.30, and 15657.5[8]*

Financial elder abuse occurs when a person "takes, secretes, appropriates, obtains or retains real or personal property of an elder." WIC § 15610.30(a)(1). A person commits financial abuse by taking or assisting in taking property from an elder for a wrongful purpose or with intent to defraud, or by using undue influence. An elder is any person residing in California, over the age of 65. WIC § 15610.27. Whether undue influence occurred is based on several factors, including (1) vulnerability of the victim; (2) the influencer's apparent

---

[8] The code section citations in this subsection refer to the California Welfare and Institutions Code ("WIC").

11

authority; (3) the actions or tactics used by the influencer; and (4) the equity of the result. WIC § 15610.70. Plaintiff bears the burden of establishing that Defendant is liable for financial abuse by a preponderance of the evidence. WIC § 15657.5. Additional remedies are available upon a showing of recklessness, oppression, fraud, or malice, by clear and convincing evidence. *Id.*

The issues to be determined are whether Defendant took the Settlement Funds from her parents directly or by exerting undue influence over them or assisted in the process. The parties agree that Edgar and Teresa were elders for the purpose of this analysis.

### *1) Whether Defendant Took, Secreted, Appropriated, Obtained, or Retained the Settlement Funds for a Wrongful Purpose or With an Intent to Defraud.*

As addressed previously, Plaintiff did not establish that Defendant took or appropriated the Settlement Funds in a manner that was counter to Edgar and Teresa's requests or assisted another in such an activity. Defendant received and benefited from the Settlement Funds during her parents lives, as did multiple family members. While Defendant may have received more than her siblings, this is not dispositive, as there is no indication that either Edgar or Teresa focused on an even distribution between family members; instead, they looked to meet the needs of others where possible. Further, there is no evidence to establish that Defendant distributed funds to herself without the authorization or knowledge of Edgar or Teresa. Plaintiff did not establish a claim for financial elder abuse for a direct taking or for assisting a taking.

### *2) Whether Defendant Wrongfully Took the Settlement Funds Through Exercise of Undue Influence.*

Undue influence takes into consideration four factors: vulnerability of the victim, the influencer's apparent authority, the actions or tactics of the influencer, and the equity of the result. WIC § 15610.70. "Evidence of an inequitable result, without more, is not sufficient to prove undue influence." WIC § 15610.70(b).

12

*(a) Vulnerability of the Victim*

Vulnerability of the victim focuses on the mental ability of the elder, their education level, the degree of isolation, or suffering from an illness. WIC § 15610.70(a)(1). No evidence was presented that either Edgar or Teresa were mentally vulnerable, despite their physical illnesses. As a result of the Settlement Funds, each was more financially secure at the end of their lives than they had been previously. There is no evidence of isolation as a large family provided much social interaction and a big network to rely on as health and family issues arose. Edgar and Teresa lived with Defendant and her family for an extended period. But after Edgar's diagnosis with mesothelioma, Plaintiff moved them into his home and began to take a more active role in their care. While there is some dispute about whether Edgar and Teresa were pleased with this change, it increased the separation between Defendant and her parents. As a result, the parents had greater opportunities to reach out to other family members if they chose. Each continued to receive necessary medical care until their deaths. Edgar received treatment for mesothelioma and Teresa received a liver transplant that the family believed provided a benefit to her. As such, this factor weighs against undue influence.

*(b) The Influencer's Apparent Authority*

It is undisputed that Defendant was a favored child and the primary manager of her parent's finances and had expansive authority. WIC § 15610.70(a)(2). Her long-term management of their finances and close relationship provided her with the opportunity to influence and direct their choices. As such, this factor weighs in favor of undue influence.

*(c) The Actions or Tactics Used by the Influencer*

Plaintiff did not put forth any evidence Defendant controlled access to the parents' medication, necessities of life, access to information, or tried to intimidate their parents. WIC § 15610.70(a)(3). During a significant portion of this period, the parents lived with Plaintiff. As such, he was able to ensure that medication was available, that they went to their medical appointments, and that their necessities of life were met. The testimony of all witnesses is clear that multiple family members interacted with Edgar and Teresa throughout their lives.

13

Receipt of the Settlement Funds initiated two significant changes.  First, Edgar opened the joint Citibank account with Defendant for the Settlement Funds.  As there is testimony that for many years, Edgar and Teresa provided Defendant with cash and she paid bills through her checks, it is reasonable for Edgar to have opened a checking account in his name for deposit of the Settlement Funds.  Second, after Edgar's death, Teresa requested that the Settlement Funds be issued in Defendant's name.  The evidence demonstrates that Teresa's motivation was to maintain her Medicare health insurance as she needed on-going treatment, ultimately, receiving a liver transplant.  As such, these changes are appropriate to the time and place, and consistent with meeting the needs of Edgar and Teresa. Further, Defendant has not been shown to control or intimidate her parents.  This factor weighs against a finding of undue influence.

### *(d) The Equity of the Result*

Lastly, the economic consequences to the parents or divergence from the parent's prior course of conduct is considered.  WIC § 15610.70(a)(3).  Edgar's receipt of the Settlement Funds was a significant change in the parents' lives.  The money provided additional financial security and the opportunity for generosity, yet it was directly tied to Edgar's impending death.  From the time the Settlement Funds began, the parents generally treated the funds in the same manner; Edgar in gifts to close and extended family members and Teresa in family travel and support.  Throughout, the parents provided Defendant the same authority and access to the Citibank account and funds received from the Law Firm.  Both parents spent money in larger amounts than before and relied on Defendant for information as to how much money was available.  There is no indication that the economic consequences were hidden from either parent.  Near the time of his death, Edgar learned that only limited funds remained when he sought to make a gift to an uncle and was informed that the money was gone.  This factor does not weigh in favor of showing undue influence.

As applied, the factors do not indicate that Defendant exerted undue influence over her parents in regard to the Settlement Funds.  Although not expressly stated, Plaintiff's claim is that Defendant received greater amounts than the other siblings, resulting in an inequitable

14

distribution of the Settlement Funds among the family members. Yet, the statute expressly provides that an inequitable result, without more, is not enough to establish undue influence. Accordingly, I find that Plaintiff did not establish that Defendant committed financial elder abuse against Edgar and Teresa, either directly or through the exertion of undue influence.

*F) Willful and Malicious Injury – Bankruptcy Code § 523(a)(6)*

Plaintiff alleges any allowed claims should be excepted from discharge based on willful and malicious injury, pursuant to § 523(a)(6). This exception to discharge requires an intentional tort or its equivalent as the basis of the claim. *See Kawaauhau v. Geiger*, 523 U.S. 57, 61-62 (1998). In order to apply, the bankruptcy court must find the injury inflicted by the debtor was both "willful" and "malicious." *In re Ormsby*, 591 F.3d at 1207. Plaintiff has not established an intentional tort or equivalent injury related to the Settlement Funds through his remaining claims. As such, § 523(a)(6) does not apply.

*G) Accounting*

Finally, Plaintiff seeks an accounting of the Settlement Funds. This requires a showing of a fiduciary relationship between Plaintiff and Defendant, or a showing that the accounts are so complicated that they cannot otherwise be determined. *See Fleet v. Bank of America N.A.*, 229 Cal. App. 4th 1403, 1413 (2014). Plaintiff has not established either. Defendant only managed money on behalf of her parents, neither of whom is a party to this action. Thus, Defendant was never a fiduciary of Plaintiff. Further, evidence at trial confirms that the accounts are not unduly complicated. Defendant's Exhibit G provides a listing and explanation of each check signed by Defendant on the Citibank account. The signed checks are still disputed by Plaintiff but there has been no showing the accounts are so complicated to justify an accounting.

15

*2) Van*

In 2008, a van was purchased for Plaintiff. Around the time of Plaintiff's birthday, Edgar, Plaintiff, and Harold went to the dealership to pick out a van. They then called Defendant to join them at the dealership and complete the purchase. At Edgar's direction, Defendant used Settlement Funds from the Citibank account for the purchase. Although Plaintiff regularly drove the van, the sale agreement identified Defendant as buyer and it was covered by her insurance.[9]

Following Plaintiff's earlier divorce, he did not maintain a bank account or hold assets in his name. Four months after the van purchase, Defendant sent an email to Plaintiff requesting that he provide her with the name of who the van should be signed over to so that she could send him the pink slip.[10] Almost a year later, emails between Plaintiff and Defendant continued to address transfer of the van.[11] It was never accomplished.

After Teresa's death, Plaintiff learned the amount of Settlement Funds received and began questioning Defendant's use of them. Harold told Defendant that Plaintiff was speaking negatively about her constantly. Defendant then called Plaintiff and an argument ensued. Defendant told Plaintiff she would take the van back and went to Plaintiff's house to find the van. This led to another argument which escalated, and the police were called. After some persuasion by the police, Plaintiff admitted that the van was at the dealership. Defendant then went to the dealership and instructed them that the van should only be released to her as owner.

Plaintiff asserts claims for embezzlement, larceny and conversion based on Defendant's taking of the van.

---

[9] Exhibits M and 56
[10] Exhibit 56
[11] Exhibit 56

*A) Embezzlement - § 523(a)(4)*

Embezzlement does not apply as the second element is not satisfied. The van was rightfully in the possession of a nonowner. However, Defendant—the legal owner—appropriated it instead of a nonowner. Accordingly, Plaintiff did not establish this claim.

*B) Larceny - § 523(a)(4)*

Larceny also does not apply because it requires the original taking of the van to be unlawful. Defendant held title of the van from its purchase. Her taking possession of her own property does not constitute larceny because it was not unlawful. Therefore, Plaintiff did not establish this claim.

*C) Conversion – California Common law*

Here, the question presented is a novel one – may the owner of a property convert property in the rightful possession of another? The first element of conversion requires "either ownership and the right of possession or actual possession" at the time of the alleged conversion . . . ." *Sanowicz*, 234 Cal. App. 4th at 1041.

Applying the factors for conversion, Plaintiff fails to meet the first element. Plaintiff had a right to possess the van which he exercised without interruption for approximately three years. However, he lacked ownership as legal title was in the name of Defendant. Therefore, he did not maintain ownership and the right of possession. Further, Plaintiff was not in actual possession of the van because it was at the dealer when Defendant came to repossess the vehicle. Defendant then instructed the dealer not to release the van to anyone. Defendant took the van in retaliation for Plaintiff's challenging her past actions with their parents' money. Indisputably, if Defendant was not owner of the van this would have been a wrongful act. However, in a dispute between two parties with claims to the van, the individual whose claim is based on its legal ownership prevails. *Moody v. Goodwin*, 53 Cal. App. 693, 394 (Cal. Ct. App. 1921) (finding that a claim for damages based on trover cannot be brought against the true owner); *see Metro. Fin. Corp. of Cal. v. Morf*, 42 Cal. App. 2d 756, 759

17

(1941) (stating the registered legal owner has a superior title in a vehicle). "Replevin, trespass, and trover (conversion) are concurrent remedies for a wrongful taking of goods." *Cross v. Berg Lumber Co.*, 7 P.3d 922, 932 (Wyo. 2000).

As such, Plaintiff did not establish a claim for conversion of the van against Defendant.

### D) Willful and Malicious Injury - § 523(a)(6)

Based on Plaintiff's closing argument, he appears to also seek to establish a claim for willful and malicious injury based on Defendant's taking of the van. Section 523(a)(6) first requires a willful, meaning deliberate or intentional, injury. This is satisfied if Plaintiff shows that the Defendant either had a "subjective motive to inflict the injury or that the debtor believed that [the] injury was substantially certain to occur as a result of [her] conduct." *In re Jercich,* 238 F. 3d 1202, 1208 (9th Cir. 2001). Here, Defendant's testimony is sufficient to establish that in contacting the dealership she was at least substantially certain that he would be prohibited from regaining possession of the van used by him for three years. Second, Plaintiff must establish Defendant caused a "malicious injury": a wrongful act, done intentionally, that necessarily causes injury and is committed without just cause or excuse. *In re Plyam*, 530 B.R. 456, 463-64 (9th Cir. BAP 2015). Here the claim fails. Defendant's taking of the van, which as a matter of record title was her property, does not constitute a wrongful act. Again, Plaintiff did not establish a claim on this basis.

### 3) Ownership of 1791-1793 E. Williams Property

In the 1980's, Leo purchased the property at 1791-193 E. Williams (the "House"). Leo's purchase of the House was assisted by two brothers and a friend co-signing the loan. Each of these individuals later reconveyed their title back to Leo. In July 1995, Leo transferred title of the House to Defendant to avoid it being subject to a potential judgment.[12] Defendant returned title to Leo three months later. Then, in 2000, Leo transferred title to

---

[12] Exhibit Q provides a record of title report from July 20, 1995 through May 25, 2012.

Case: 16-05026    Doc# 107    Filed: 01/07/19    Entered: 01/08/19 10:34:00    Page 18 of 20

Defendant. From that point through at least May 2012, title to the House was held by Defendant as her sole and separate property, or jointly with her former or current husband. Mortgages were recorded against the House (listing Defendant as borrower) in 2003, 2004, and 2006.

Over the course of this period, various people lived at the House, including Defendant, Edgar and Teresa, and tenants. During their lifetimes, Edgar and Teresa received rent from the House. Prior to receipt of the Settlement Funds, rents were used to pay the mortgage and property taxes. After receipt of the Settlement Funds, Edgar and Teresa would keep the rent, and the mortgage and property taxes would be paid from the Citibank Account holding the Settlement Funds.

At all relevant times, Defendant was owner of the House. Neither Plaintiff, Edgar, nor Teresa owned it. As such, the House was not their property, and there is no basis for Plaintiff to assert a claim against Defendant for actual fraud, embezzlement, larceny, conversion, willful and malicious injury, or elder and financial abuse under California law based upon ownership of the House or rents received from it. As such, all claims for relief based upon the House are denied.

Conclusion

Consistent with the findings herein, Judgment is entered for Defendant contemporaneously herewith.

**END OF MEMORANDUM DECISION**

# COURT SERVICE LIST

**Via ECF:**

All ECF Recipients